

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2016 MAY 26   PM 12: 01

CLERK'S OFFICE
AT BALTIMORE

BY _____ DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Baltimore Division*

CHELSEA RALEY
    12810 Bowling St.
    Cumberland, MD 21502

    *Plaintiff,*

v.

MARYLAND STATE POLICE
    1201 Reisterstown Rd.
    Pikesville, MD 21208

    Serve:  Col. William M. Pallozzi
            Secretary, Maryland State Police
            1201 Reisterstown Rd.
            Pikesville, MD 21208

    *Defendant.*

Case No. **JKB 16 CV 165 4**

**Complaint for Violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e and the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-606**

**Jury Trial Demanded**

## PRO SE CIVIL COMPLAINT FOR
## MONETARY RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff, Chelsea Raley files this Civil Complaint against the Maryland State Police for

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e ("Title VII"), and the

Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-606 ("MD FEPA").

## INTRODUCTION

1.      Chelsea Raley is a homosexual female who has been employed by the Maryland

State Police since 2008.

2.      Raley was transferred to the Cumberland Barracks in Allegany County in 2014.

3.      As the only female and only homosexual State Trooper in the Cumberland Barracks, Raley has been discriminated against, retaliated against, and made to work in a hostile work environment.

4.      Maryland State Police management has knowledge of Raley's treatment, and despite substantiating Raley's claims through an Office of Fair Practices investigation, has not taken action to remedy the discrimination, retaliation, or hostile work environment Raley continues to experience.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action generally pursuant to 28 U.S.C. § 1331 because this action  asserts claims that arise under the laws of the United States, specifically, 42 U.S.C. § 2000e, *et seq.*,

6.      Raley has exhausted the administrative remedies available to her under 42 U.S.C. § 2000e, *et seq.* The U.S. Equal Employment Opportunity Commission issued Raley a Dismissal and Notice of Rights on February 26, 2016. This Complaint and Demand for Jury Trial is timely filed within the ninety (90) day period allowed by 42 U.S.C. § 2000e-5(f)(1).

7.      This Court has supplemental jurisdiction over Raley's MD FEPA claims pursuant to 28 U.S.C. § 1367 as the facts that support Plaintiff's State law claims are the same as those alleged for her federal claims.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or substantially all of the unlawful employment practices alleged occurred within this judicial district.

2

## PARTIES

9.      Plaintiff Raley is a resident of Cumberland Maryland.

10.     Raley is employed as a Trooper First Class with the Maryland State Police in its Field Operations Bureau.

11.     Raley is currently assigned to the Cumberland Barrack in Allegany County.

12.     Defendant Maryland State Police is a department of the State government of Maryland, and the statewide law enforcement agency for the State of Maryland.

13.     According to the Maryland State Police website, the Maryland State Police is a paramilitary organization with its organizational structure and rank structure modeled after the United States military. The Maryland State Police is comprised of: Department of State Police (commanded by the Colonel); Bureaus (commanded by a Lieutenant Colonel); Commands (commanded by a Major); Troops (commanded by a Captain); Divisions (commanded by a Captain or Civilian Director); Barracks (commanded by a Lieutenant); Sections (commanded by a Captain, Lieutenant, or Civilian Director); Units (commanded by a First Sergeant)

14.     All subdivisions of the Department of State Police fall under the Office of the Superintendent and are a part of one of three bureaus: Filed Operations Bureau; Criminal Investigation Bureau; or Support Services Bureau.

## FACTUAL ALLEGATIONS

### Raley's Employment History with the Maryland State Police

15.     Raley began her employment with the Maryland State Police in June 2008 as a civilian cadet.

3

16.     Raley entered the State Police Academy on February 1, 2010 and graduated from the Academy as a State Trooper on July 31, 2010. After three years of satisfactory service, Raley was promoted to Trooper First Class in February 2013.

17.     As a State Trooper, Raley was first assigned to the College Park Barrack in Prince George's County, Maryland. Raley worked in the College Park Barrack from July 31, 2010 through May 4, 2011.

18.     In May 2011, Raley was transferred to the Rockville Barrack in Montgomery County, Maryland, and worked there from May 5, 2011 through September 2012.

19.     In September 2012, Raley was selected for a specialized unit, the Commercial Vehicle Enforcement Division in Frederick, Maryland. Raley worked with the Commercial Vehicle Enforcement Division from September 2012 until April 2014.

20.     All of Raley's quarterly reviews from the time she joined the Maryland State Police in 2008 through her assignment to the Cumberland Barrack in April 2014 were positive.

21.     In April 2014, Raley was assigned to the Cumberland Barrack in Allegany County, Maryland where she reported on April 22, 2014 and has been working ever since.

22.     When Raley reported to her first shift in the Cumberland Barrack, she was assigned to group 2, under the command of Corporal Theodore Bell. Also assigned to group 2 was Trooper First Class Matthew Schoenadel, Trooper First Class Shawn Bennett, and Trooper First Class Samuel Sarver.

***Trooper First Class Bennett Begins Questioning Raley's Sexual Orientation***

23.     In or around the beginning of May 2014, before Raley was assigned a patrol vehicle, Raley was riding along with Bennett.

4

24.     During one particular ride along, Bennett was discussing a female acquaintance of his from Carroll County who is a homosexual. Bennett told Raley that Bennett had to travel to Carroll County to attend court in the near future and when he went down there he was going to meet up with this woman socially to get a drink after work. Bennett told Raley that Bennett had offered to be this woman's sperm donor and then proceeded to offer to be a sperm donor for Raley and her girlfriend and roommate at the time.

25.     Raley did not respond to this comment, and felt that Bennett made this comment as a way to elicit information about Raley's personal life without directly asking Raley if she was a homosexual, or if she was dating her roommate at the time.

26.     While Raley did not hide the fact that she was a homosexual when she started with the Maryland State Police or when she was assigned to the Cumberland Barrack, she also did not tell her co-workers about her sexual orientation or dating life.

27.     Despite not sharing information about her sexual orientation, Raley knows that her co-workers knew she was a homosexual.

### *Raley's Boss and Co-Workers Behave Inappropriately in the Office*

28.     In or around the middle of May 2014, Bell, Bennett, Schoenadel, and Raley were in the duty officer's room of the Cumberland Barrack during their shift, and Schoenadel got up to use the restroom.

29.     While Schoenadel was out of the duty officer's room, Bell took Schoenadel's cell phone, accessed Schoenadel's Facebook page, and posted a picture with approximately 20 dildos to Schoenadel's Facebook wall.

30.     While Bell had Schoenadel's phone, Bell was laughing, and told Bennett and Raley that he was posting "something" to Schoenadel's Facebook wall.

31.     Because Bennett and Raley were Facebook friends with Schoenadel, they both went to Schoenadel's Facebook page to see what Bell had posted. It was then that Raley saw Bell posted a picture with dildos to Schoenadel's Facebook wall.

32.     After seeing the picture, Raley did not say anything to Bennett or Bell, but she stood up, walked to her car, and drove around so as to not be part of the situation.

33.     Shortly after Bell posted the pictures of the dildos on Schoenadel's Facebook, in or around the end of May 2014, Raley walked into the duty officer's room to get something that was in the room, and saw Bennett and Bell in the room.

34.     As soon as Raley walked into the room, Bennett who was previously showing an image on his phone to Bell, turned his phone screen toward him, and said "oh shoot, Raley is here now." Bennett then went on to say out loud to the people in the room, including Raley, that the image on his phone was his "meat of the month."

35.     Raley did not respond to Bennett, but grabbed what she went into the duty officer's room to get, and left, while the men in the room laughed at Bennett's "meat of the month."

36.     Raley believes that Bennett was showing Bell and the other men in the room a picture of a naked woman.

***Bell Targets Raley***

37.     In or around June 2014, Bell told Raley that Raley needed to stop "skipping out on calls" when Raley is the closest trooper to the call.

6

38.     Raley asked Bell what he was talking about because she did not recall a time she had skipped a call.

39.     Bell responded that earlier in the month, during the late shift, a call came over the radio and another trooper saw Raley driving by the barrack at the time the call came out and that given her proximity to the call, Raley should have been the first trooper to respond, but instead she was the third trooper to respond.

40.     Raley told Bell that she recalled the night in question and she was not driving by the barrack at that time but was instead at her house using the bathroom. Raley told Bell that the information he had was false, any marked Maryland State Police patrol car could have been driving by the barrack at that time, and that if Bell checked the GPS information for Raley's car on the evening in question Bell would see that Raley was not closest to the call that night.

41.     Bell responded that Raley was probably right but warned her again not to skip out on calls.

42.     Raley replied that she did not skip out on any of her calls.

43.     Shortly after this conversation, in or around late June 2014, Raley responded to a domestic disturbance call along with Sergeant James Pritts.

44.     Raley told Pritts that she would do the report and the paperwork for the call but Pritts responded, "No, I'll handle it. I see how big of a case load Bell gives you."

45.     Even prior to Pritts' comment, Raley knew that Bell was giving her a larger case load than her male counter parts.

46.     Bell was giving Raley more work than her male counterparts despite the fact that Raley had never worked at a full service barracks before and her male counterparts had prior full service barrack experience before.

47.     From May 2014 through October 2014, while Raley was under Bell's command, Raley handled thirty four (34) criminal investigation reports and sixteen (16) accident reports.

48.     In the same time period, Bennett handled twenty five (25) criminal investigation reports and seven (7) accident reports.

49.     In the same time period, Schoenadel handled nineteen (19) criminal investigation reports and thirteen (13) accident reports.

50.     In the same time period, Sarver handled twenty two (22) criminal investigation reports and eleven (11) accident reports.

### Bennett Discusses Raley's Personal Life in the Office

51.     In or around September 2014, Raley was out on sick leave and asked a friend and colleague, Master Trooper Henry Doll, to complete Raley's pay form (form 31) for Raley. Doll agreed to complete Raley's pay form for her.

52.     After returning from sick leave, Doll informed Raley that when Bennett discovered Doll was completing Raley's pay form for her, Bennett said to Doll, "how is Raley paying you for doing her pay form? What are you getting out of it?"

53.     Doll responded that he wasn't "getting anything out of it" and was completing the form for a fellow trooper and friend as a favor.

54.     Bennett stated, "oh yea, you don't have to worry about [Raley] paying you back because [Raley] is a lesbian."

55.     Doll told Bennett that he did not care if Raley was a homosexual and he was simply doing Raley a favor.

8

56.     Bennett went on to announce to everyone in the room that Bennett had seen a picture of Raley "making out" with a woman and that Bennett believed Raley had deleted him from her Facebook because Raley was embarrassed of her private life.

57.     Bennett and a dispatcher who was in the room at the time then pulled up Raley's Facebook photos and Meyers told Bennett that she didn't see any pictures of Raley that indicated Raley was a homosexual.

58.     Doll told Raley that at the time of this conversation, dispatcher Lindsay Meyers, Trooper First Class Phillip Spicer, and a currently unknown supervisor were in the duty officer's room along with Bennett and Doll, and they overheard the whole conversation.

59.     After learning of Bennett's comments, Raley approached Bennett in the parking lot of the Cumberland Barrack and asked Bennett about the incident.

60.     Bennett admitted to making the comments about Raley in front of others and went on to tell Raley that Bennett believed Raley was afraid to tell Bennett and the other members of the work group that Raley was a homosexual.

61.     Raley responded that her private life was her own business and if she wanted to discuss it with any of her colleagues, she would.

62.     Bennett then stated that Raley "shouldn't be afraid to admit" that she was a homosexual.

63.     At that point, Raley ended the conversation and walked into the barrack.

***Bell Finds Fault with Raley When Other Supervisors Do Not Because Bell is Targeting Raley***

64.     Through the summer of 2014, Raley continued to do well in her job, and in August 2014, Lieutenant Homer Martz held a meeting with Bell, Sergeant Mitch Stailey, and

9

Raley to tell everyone what a good job Raley had done over the last few months with her stops despite how many reports Bell had assigned Raley and the fact that Raley had never worked in a full service barrack before.

65. Bell was on paternity leave for the months of September and October 2014, and returned from leave on October 27, 2104. During that time, Raley and the rest of the work group reported to Sergeant Mitch Stailey.

66. While reporting to Stailey, Raley received positive feedback on her work from Stailey and the barrack commanders.

67. In or around September 2014, Stailey sent Raley a message on the Maryland State Police's internal messaging system CAPWIN saying "awesome job on your stats for this month!"

68. On October 27, 2014, the day Bell returned from leave, Bell called Raley into one of the offices and told Raley that he had heard the following things about Raley's work while he was on leave:

a. Raley was "timid" while handling calls.

b. An off duty trooper was driving in front of Raley and it appeared as if Raley was texting while driving.

c. Bennett told Bell that Raley called Bennett and asked him to meet her at the Commissioner's Office with a hand cuff key because Raley left her key in her other uniform pants and that when Bennett arrived, Raley had Bennett un-cuff the prisoner, take the prisoner into the Commissioner's Office and then re hand cuff the prisoner.

10

d. Raley was asking her co-workers too many questions and asking for too much help. Bell told Raley that from that point forward if Raley had a question about calls or locations of calls she was not allowed to ask her colleagues and had to direct all questions to Bell. Bell also informed Raley that Bell had told Raley's co-workers to watch for mistakes Raley made and report them to Bell, but that they were not allowed to assist Raley on properly handling calls.

69.    Bell also told Raley that he had listed in her job observation folder that Raley was seen using her cell phone at Maryland State Police events and that this reflected poorly on Raley. Prior to this, Bell had never said anything to Raley about her cell phone use.

70.    Bell also stated to Raley that he knew she had posted a picture at a vehicle accident scene and told Raley "just because you have deleted all of us from Facebook, don't think I can't see your activity on Facebook."

71.    Raley felt that Bell said this in an intimidating way to imply that Bell would be watching what Raley did in her personal life.

72.    In fact, Raley had not posted that picture, but was tagged in the picture at the accident scene by someone else, and Raley had no control over that person tagging her. Raley told Bell she did not post the picture, but was only tagged in the picture.

73.    Bell did not accept Raley's explanation and told her that he was documenting the fact that she posted on Facebook a work related photo in Raley's observation file.

74.    Bell then issued Raley a negative form 165 (personal counseling form) based on a September 2014 incident where Raley posted a status on Facebook that said, "oh great, I just stopped Amanda Mangan." Mangan is a local radio personality. Raley deleted the status shortly after she posted it but did acknowledge that it was not appropriate.

75.     Bell told Raley that posting to Facebook while on shift was not appropriate and that her actions made the Maryland State Police look bad.

76.     Raley responded to Bell's allegations by pointing out that he was placing information in her job report that he did not personally witness which was against protocol, and that Raley felt as if Bell was "trying to get [Raley] in trouble" to get her fired. Raley also pointed out that the allegations were hearsay and not true.

77.     Bell would not listen to Raley's version of events, specifically as it related to Bennett brining Raley a hand cuff key.

78.     Bell replied, "[i]f I didn't like you, I would get you demoted and transferred down state for posting that you stopped Amanda Mangan on Facebook."

79.     Bell posted to Facebook while on shift, used his phone while driving his Maryland State Police patrol vehicle, and posted comments to social media and allowed other people to comment in disparaging ways about Maryland State Police equipment.

80.     In or around October 2014, Trooper First Class Samuel Sarver who was in Raley's group took time off work.

81.     When Sarver returned, Sarver was told by Bennett and Schoenadel that Bell told Bennett and Schoenadel not to be surprised if they had negative job observation reports or got written up for small violations because Bell did not want it to look like he was singling out Raley.

82.     Around this same time, Bell told the rest of the group that Bell was singling Raley out.

***Raley Reports Bell and Bennett***

83. On or about October 31, 2014, Raley emailed the Lieutenant of the barrack, Homer Martz and asked to meet with Martz to discuss the discrimination and harassment Raley was experiencing from Bell and Bennett.

84. Martz agreed to meet with Raley and told Raley to bring a friend if that would make her more comfortable.

85. On or about November 3, 2014, Raley met with Martz and Raley's mother, Michelle at the library in LaVale, Maryland.

86. At this meeting, Raley told Martz about Bennett's behavior toward her including Bennett's comments prying into Raley's personal life, making comments in front of other employees that Raley was a homosexual, and showing pictures of naked women in the barrack.

87. Martz tried to make excuses for Bennett's behavior and told Raley and her mother that Bennett was born a "male" so he was already born with a disability and Martz referred to Bennett as "retarted."

88. Raley also tried to tell Martz about Bell's behavior toward Raley and how she believed Bell was singling her out, treating her unfairly, and that what Bell was doing was "not right."

89. Michelle told Martz about Bell's instruction to Raley that she was not allowed to ask fellow troopers for assistance and she had to route all questions and requests through Bell. Michelle then brought up a situation in Pennsylvania where two state troopers were shot and killed, and told Martz that Bell's instructions to Raley put Raley at risk and was a safety issue.

90. Every time Raley brought up Bell, Martz ignored the comment, changed the subject, attempted to shift the attention to Bennett, and made it clear he did not want to hear about Bell's behavior.

13

91.    At the end of the meeting, after going back and forth about the decision, Martz told Raley that he was going to file a form 51 (Harassment) with the Office of Fair Practices on Raley's behalf against Bennett.

**_Raley Faces Retaliation_**

92.    Martz filed the form 51 with the Office of Fair Practices on or about November 3, 2014.

93.    In or around November 2014 envelopes from the Office of Fair Practices were placed on the top of Bennett and Raley's mail boxes in the duty officer's room for everyone to see that a complaint had been filed that involved Bennett and Raley.

94.    Everyone in the barrack quickly found out that Raley had filed a harassment complaint against Bennett.

95.    On or about November 12, 2014, Raley was switched to work group 3 to be effective immediately. In work group 3, Raley was told that she would report to Corporal Kevin Zuzak and Sergeant William Elliott, not Bell, and the work schedule was such that she would not work the same shift as Bennett and Bell.

96.    Initially, Raley requested, and was told, that she would be assigned to work group 4. Raley requested to be placed in work group 4 because she got along well with all of the troopers in that group, including Doll.

97.    Once Bennett learned Raley requested to be placed in work group 4, Bennett told Bell that Doll was "stalking" Raley.

98.    Doll was not stalking Raley and in fact the two troopers were colleagues and friends.

14

99.     Based on Bennett's lie that Doll was "stalking" Raley, Martz changed his mind, and assigned Raley to work group 3.

100.    On or about November 14, 2014, the engine in Raley's assigned patrol vehicle exploded, and the car was taken out of service for repairs.

101.    Prior to leaving her car for repairs, Raley cleaned everything out of the vehicle and made sure that the trunk was organized.

102.    Raley was then assigned to drive other troopers' patrol cars until she was assigned her own car again.

103.    On or about November 20, 2014, one hour prior to being off her shift for the day, Raley ran into Bell, who had just started his shift, in the duty officer's room.

104.    Bell informed Raley, in front of Bennett, that he was going to do Raley's vehicle and personnel inspection, and told Raley that even though Raley had switched working groups, Bell was still in charge of Raley.

105.    This was contrary to the information Raley got from Martz and the Office of Fair Practices Investigator, Sergeant Stacy Gappert.

106.    Raley informed Bell that her car had been out of service for a week and that she was driving another trooper's vehicle.

107.    Once outside, Bell made Raley sign her job observation report for the month.

108.    Raley refused to sign the parts that contained false information.

109.    Bell then asked Raley to show him all of the contents inside of her medical bag.

110.    Bell had never asked Raley or any of her male counterparts to show him their medical bags before this incident.

111.    Bell then instructed Raley to open the trunk of her car even though it was out of service.

112.    Raley opened the car's trunk and the trunk was organized.

113.    Bell then looked through the window of the car, and without even opening a door said to Raley, "your vehicle is atrocious."

114.    Raley objected and said that her vehicle was not atrocious, she had cleaned everything out of it, and that it had been out of service for a week.

115.    Bell told Raley that the vehicle was horrible looking and would need to be cleaned before Raley was able to leave for the day. Bell than asked if Raley had any questions, when Raley replied, "no" Bell said very sarcastically, "okay have a great night!"

116.    Because Raley's car was in the parking lot waiting for repairs, it was not close enough to the hose for the hose to reach the car, and the car could not be moved closer to the hose because the engine did not work. Because of this, Raley had to use a hand towel to wash off the car's exterior.

117.    According to the Maryland State Police manual, vehicles that are out of service are not to be inspected.

118.    The next day, on or about November 21, 2014, Raley received a negative 164 (disciplinary write up form) from Bell that stated Raley's vehicle was a "mess."

119.    Upon receiving the negative 164, Raley contacted Gappert with the Office of Fair Practices and told Gappert about the incident with Bell the night before.

120.    Once Raley reported Bell's behavior to Gappert, Bell was also included in the Office of Fair Practice's investigation.

16

***The Office of Fair Practices Investigates***

121.    As part of her investigation, Gappert spoke with Raley, Sarver, Bennett, Bell, and a few other troopers who Gappert did not disclose to Raley.

122.    Throughout November and December 2014, everyone in the barrack knew about Raley's complaint and employees were discussing the complaint openly on social media and on CAPWIN.

123.    Since filing the complaint, many of the male troopers at the Cumberland Barrack have made Raley the subject of their jokes, comments, and jabs.

124.    One December 8, 2014 in a CAPWIN chat, Senior Trooper Mark Lechliter wrote, "just watch who you stop...don't want there to be complaints filed against you too!!! There are people in this room that file them" referring to Raley.

125.    On December 10, 2014 in a CAPWIN chat, Schoenadel wrote, "IM OFFENDED I MEAN." This was also in reference to Raley as troopers at the barrack used to say that Raley only filed her complaint against Bennett and Bell because she was offended.

126.    On December 11, 2014 in response to a Facebook photo posted by Schoenadel, Bell comments, "id comment matt but ill keep my mouth shut. I know it might show up somewhere else." This comment is referencing the Office of Fair Practices Investigation which Bell knew was reviewing Facebook posts.

127.    In December 2014, Martz was instructed to send an email to everyone in the barrack instructing them not to discuss the Office of Fair Practice investigation.

128.    Despite being told to do so, Martz never sent an email telling the staff not to discuss the Office of Fair Practice investigation, and so it continued to be a topic of conversation.

17

129.    In or around December 2014, Martz asked Raley how things were going since being transferred to work group 3.

130.    Raley replied that things were going well with work group 3 but that she was having anxiety issues and her doctor had prescribed Raley anti-anxiety medication, and was concerned that everyone was talking about the investigation.

131.    Martz advised Raley against taking the anti-anxiety medication because Raley would have to fill out additional paperwork with the Maryland State Police.

132.    Also during this conversation, Martz told Raley that she should not stay with the Maryland State Police for her whole career and that Raley should apply to the FBI or CIA and use the fact that she is a female to her advantage.

133.    Throughout the Office of Fair Practice's investigation, Raley felt that Martz was trying to protect Bennett and Bell and as such, Martz has not taking action to remedy the discrimination and retaliation targeted at Raley.

**Bell Tries to Cover His Tracks**

134.    Once Raley filed a complaint against Bell in November 2014, Bell began singling out Sarver and writing Sarver up for small things including vehicle cleanliness.

135.    Bell began singling out Sarver and writing Sarver up for minor infractions to cover the fact that he was previously singling out Raley.

**The Office of Fair Practices Substantiates Raley's Complaint and Raley is Still Retaliated Against**

136.    On May 7, 2015, the Office of Fair Practices issued Raley a letter stating, "it has been determined that there was evidence to support the allegations of discrimination based on

18

sex (gender), sexual orientation and retaliation. Therefore, appropriate corrective action will be taken to address the violation."

137. The Cumberland Barrack had to go through additional re-training, but according to Raley all this involved was clicking through electronic signature blocks on the computer.

138. After the Office of Fair Practices sustains allegations, the Maryland State Police Internal Affairs Unit handles the discipline of officers. Once the Internal Affairs Unit closed its investigation, Bennett was bragging in the barrack that nothing happened to him, and he did not receive any discipline.

139. Bennett was also overheard in the barrack stating that Bell received a negative 164 (disciplinary write up that is less severe than a 165) for allowing troopers to display naked pictures.

140. Raley has received messages from Maryland State Police employees in other counties asking about Raley's complaint and telling her rumors they have heard about her.

141. Syd Sarrichio a dispatcher for the Maryland State Police who works in Rockville, Maryland, sent a text message to Raley in or around April 5, 2016 "[r]umor has it that you have a target on your back the size of Alaska. For the thing that happened with [B]ell." Sarrichio went on to say " . . . they are watching you to do something wrong."

142. When asked, Sarrichio said that it was the first sergeant at his unit who told him this information and "she mentioned you were being watched."

143. Bell was transferred to the Rockville Barrack in or around January 2016.

144. In or around July 2015, Raley's new supervisor, Corporal Kevin Zuzak met with Raley to review her six month appraisal.

19

145.    During this meeting, Zuzak told Raley that he had no complaint about her job performance and that after reading Bell's appraisal from the prior year, Zuzak did not observe Raley doing any of the things Bell claimed Raley did while working for Bell.

146.    Zuzak told Raley that he did not agree with Bell's negative comments about Raley's job performance.

147.    On or about November 29, 2015, Martz sent Raley an email asking her to explain her "low production in November" and commented "this is unacceptable."

148.    On May 10, 2016, Raley was issued a negative 165 (personal counseling form) by Zuzak at the direction of Captain Fluharty for not making sixty (60) traffic stops per month.

149.    Zuzak also told Raley that if she consistently fails to get 60 stops per month she will be transferred. Zuzak explained that this was the message coming from upper management, not him.

150.    Raley pointed out that she had a high number of DUIs arrests and all of her other statistics are at least equal to, if not higher than other troopers in the barrack, and that she was out for eighteen (18) days in March for medical reasons.

151.    To Raley's knowledge, no other trooper at the Cumberland Barrack was issued a negative 165 based on low number of stops.

**Raley Files an EEOC Complaint**

152.    Raley filed a Charge of Discrimination alleging Discrimination, Retaliation, and Harassment in the EEOC and the Maryland Commission on Civil Rights in or around January 2015.

153.    On or about June 11, 2015, the Maryland State Police, through Carolyn Brown, Director of the Office of Fair Practices filed a Response to Raley's Charge of Discrimination with the EEOC.

154.    Maryland State Police's Response outlined all of the above complaints and stated that the "The allegations [of discrimination, retaliation, and sexual harassment] in the internal complaint were sustained."

155.    On or about September 23, 2015 the EEOC assigned investigator Janel Griffin to investigate Raley's Charge of Discrimination.

156.    On or about November 19, 2015, Raley met with Martz and then Detective Sergeant Justin Cook. Martz informed Raley that during the investigation they heard that Raley was only filing a complaint with the EEOC to get a "pay day," and that Fluharty wanted to make sure that Raley was filing a complaint with the EEOC for the right reasons.

157.    Martz went on to say that Raley had every right to file a complaint with the EEOC and Captain Fluharty wanted to know where in the process the complaint was.

158.    Raley replied that she had not heard from the EEOC in a while.

159.    Since Raley filed her complaint with the Office of Fair Practices, Martz has named Bennett trooper of the month on multiple occasions.

160.    Since Raley filed her complaint with the Office of Fair Practices, Martz has named Bell supervisor of the month.

161.    On February 26, 2016 EEOC Investigator Griffin issued a "Dismissal and Notice of Rights" to Raley.

162.    Since Raley started working at the Cumberland Barrack she has experienced anxiety and weight loss due to stress.

21

163.    Maryland State Police continues to retaliate against Raley by subjecting her to heightened scrutiny, writing her up for actions other troopers do not get written up for, and discussing her as if she has a "target on her back."

**COUNT I**
**Sex (Gender) Discrimination in Violation of**
**Title VII, 42 U.S.C. § 2000e-2**
**Against Defendant Maryland State Police**

164.    Plaintiff incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

165.    Defendants are "employers" as defined in 42 U.S.C. § 2000e.

166.    Raley is an "employee" as defined in 42 U.S.C. § 2000e.

167.    Raley is a female.

168.    Maryland State Police, through its managers, unlawfully subjected Raley to and tolerated discrimination against Raley, because of her gender.

169.    Raley is the only female trooper assigned to the Cumberland Barrack.

170.    Maryland State Police, through its managers, repeatedly discriminated against Raley, at least in part, because of her sex, by assigning Raley more work than her male counterparts, writing Raley up for minor infractions that Raley's male counterparts were not written up for, "target[ing]" Raley, and subjecting Raley to higher scrutiny and oversight than her male counterparts were subjected to.

171.    Defendant's actions give rise to a reasonable inference of unlawful discrimination based on gender because other similarly situated employees who are not female are not subject to the additional work, heightening scrutiny, disciplinary write ups, or "targeting" that Raley is subject to.

22

172.     Defendants have no legitimate business reason for the actions taken against Raley
as she has had positive reviews, has higher statistics than her male counterparts, and has
demonstrated that Bell's negative comments regarding her work are false.

173.     Raley has sustained substantial injury as a result of Defendants illegal
discrimination.


**COUNT II**
**Retaliation in Violation of**
**Title VII, 42 U.S.C. § 2000e-3**
**Against Defendant Maryland State Police**

174.     Plaintiff incorporates the allegations contained in all the foregoing paragraphs as
though fully alleged herein.

175.     Raley engaged in protected activity when she met with Leiutenant Martz on
November 3, 2014 and told Martz about Bennett and Bell's behavior toward her and that she did
not think she was being treated equally to her male team members.

176.     Raley engaged in protected activity when she participated in the Office of Fair
Practice's investigation from November 2014 through May 2015.

177.     Raley engaged in protected activity when she filed her Charge of Discrimination
with the EEOC on or about January 14, 2015.

178.     Defendant retaliated against Raley when Bell issued Raley a negative form 164
for having a "messy" car despite the fact that Bell was no longer supposed to be supervising

Raley, Raley's car was out of service and therefore not able to be subject to inspection, and was not actually "messy."

179.    Defendant retaliated against Raley when it allowed its employees in the Cumberland Barrack to discuss Raley's complaint of discrimination and harassment.

180.    Defendants retaliated against Raley when Captain Fluharty instructed Zuzak to issue Raley a negative 165 and threaten Raley with a transfer for failing to get sixty (60) stops for the month of April despite having high arrest numbers when none of the male troopers in Cumberland Barracks was issued a negative 165 for failing to make sixty (60) stops for the month.

181.    Defendants continue to retaliate against Raley by allowing management to perpetuate rumors about Raley and by targeting, watching, and subjecting Raley to higher scrutiny.

182.    Defendants have not subjected Raley's counterparts who have not filed Office of Fair Practices and EEOC Complaints to this same treatment.

183.    Raley has sustained substantial injury as a result of Defendants illegal retaliation.

**COUNT III**
**Hostile Work Environment in Violation of**
**Title VII, 42 U.S.C. § 2000e-2**
**Against Defendant Maryland State Police**

184.    Plaintiff incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

185.    Defendant subjected Raley to a hostile work environment based on her sex when its manager, Bell, allowed employees to display naked pictures of women in the office and refer to women as "meat of the month."

24

186.    Defendant subjected Raley to a hostile work environment based on her sex when its manager, Bell, posted a picture of sex toys – dildos, to a trooper's wall and then instructed Raley and another trooper to look at the photo he posted.

187.    Defendant subjected Raley to a hostile work environment when it allowed employees and managers to discuss Raley's personal life, including her relationship status, publicly.

188.    Defendants subjected Raley to a hostile work environment when it allowed employees and managers to discuss Raley's complaints of discrimination and harassment and allowed managers, even from other barracks, to tell employees that Raley had a "target" on her and was being watched by management.

189.    Defendants subjected Raley to a hostile work environment when it subjected Raley to higher scrutiny, wrote Raley up for minor infractions or based on untrue information when other colleagues were not written up for the same thing, and assigned Raley an increased work load.

190.    Defendant has knowledge of the above outlined facts and has taken no steps to stop the hostile work environment.

191.    Defendant's actions toward Raley are severe and pervasive.

192.    Raley has sustained substantial injury as a result of Defendant's hostile work environment.

**COUNT IV**
**Sex (Gender) Discrimination in Violation of**
**FEPA, Md. Code Ann., State Gov't § 20-606**
**Against Defendant Maryland State Police**

193.    Plaintiff incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

194.    Defendants are "employers" as defined in Md. Code Ann., State Gov't § 20-601(d)(1).

195.    Raley is an "employee" as defined in Md. Code Ann., State Gov't § 20-601(d)(2)..

196.    Raley is a female.

197.    Maryland State Police, through its managers, unlawfully subjected Raley to and tolerated discrimination against Raley, because of her gender.

198.    Raley is the only female trooper assigned to the Cumberland Barrack.

199.    Maryland State Police, through its managers, repeatedly discriminated against Raley, at least in part, because of her sex, by assigning Raley more work than her male counterparts, writing Raley up for minor infractions that Raley's male counterparts were not written up for, "target[ing]" Raley, and subjecting Raley to higher scrutiny and oversight than her male counterparts were subjected to.

200.    Defendant's actions give rise to a reasonable inference of unlawful discrimination based on gender because other similarly situated employees who are not female are not subject to the additional work, heightening scrutiny, disciplinary write ups, or "targeting" that Raley was subject to.

201.    Defendants have no legitimate business reason for the actions taken against Raley as she has had positive reviews, has higher statistics than her male counterparts, and has demonstrated that Bell's negative comments regarding her work are false.

26

202. Raley has sustained substantial injury as a result of Defendants illegal discrimination.

## COUNT V
### Sexual Orientation Discrimination in Violation of
### FEPA, Md. Code Ann., State Gov't § 20-606
### Against Defendant Maryland State Police

203. Plaintiff incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

204. Raley is a homosexual.

205. Despite Raley not telling her colleagues at the Cumberland Barrack that she is a homosexual, her colleagues and supervisors know or perceive Raley to be a homosexual.

206. Maryland State Police, through its managers, unlawfully subjected Raley to and tolerated discrimination against Raley, because of her sexual orientation.

207. Raley is the only homosexual, or perceived homosexual, trooper assigned to the Cumberland Barrack.

208. Maryland State Police, through its managers, repeatedly discriminated against Raley, at least in part, because of her sexual orientation, by assigning Raley more work than her colleagues, writing Raley up for minor infractions that Raley's colleagues were not written up for, "target[ing]" Raley, subjecting Raley to higher scrutiny and oversight, and allowing Raley's personal and dating life to be discussed, scrutinized, and made a joke of in the work place.

209. Defendant's actions give rise to a reasonable inference of unlawful discrimination based on sexual orientation because other similarly situated employees who are not homosexuals or are not perceived as homosexuals are not subject to the additional work, heightening scrutiny, disciplinary write ups, "targeting," or personal discussions that Raley is subject to.

27

210.    Defendants have no legitimate business reason for the actions taken against Raley as she has had positive reviews, has higher statistics than colleagues, and has demonstrated that Bell's negative comments regarding her work are false.

211.    Raley has sustained substantial injury as a result of Defendants illegal discrimination.

## COUNT VI
**Hostile Work Environment Based on Sex (Gender) and Sexual Orientation in Violation of FEPA, Md. Code Ann., State Gov't § 20-606 Against Defendant Maryland State Police**

212.    Plaintiff incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

213.    Defendant subjected Raley to a hostile work environment based on her sex and sexual orientation when its manager, Bell, allowed employees to display naked pictures of women in the office and refer to women as "meat of the month."

214.    Defendant subjected Raley to a hostile work environment based on her sex and sexual orientation when its manager, Bell, posted a picture of sex toys – dildos, to a trooper's wall and then instructed Raley and another trooper to look at the photo he posted.

215.    Defendant subjected Raley to a hostile work environment when it allowed employees and managers to discuss Raley's personal life, including her relationship status, and her sexual orientation publicly.

216.    Defendants subjected Raley to a hostile work environment when it allowed employees and managers to discuss Raley's complaints of discrimination and harassment and allowed managers, even from other barracks, to tell employees that Raley had a "target" on her and was being watched by management.

28

217.     Defendants subjected Raley to a hostile work environment when it subjected Raley to higher scrutiny, wrote Raley up for minor infractions or based on untrue information when other colleagues were not written up for the same thing, and assigned Raley an increased work load.

218.     Defendant had knowledge of the above outlined facts and has taken no steps to stop the hostile work environment.

219.     Defendant's actions toward Raley are severe and pervasive.

220.     Raley has sustained substantial injury as a result of Defendant's hostile work environment.

## COUNT VII
### Retaliation in Violation of
### FEPA, Md. Code Ann., State Gov't § 20-606
### Against Defendant Maryland State Police

221.     Plaintiff incorporates the allegations contained in all the foregoing paragraphs as though fully alleged herein.

222.     Raley engaged in protected activity when she met with Lieutenant Martz on November 3, 2014 and told Martz about Bennett and Bell's behavior toward her and that she did not think she was being treated equally to her male team members.

223.     Raley engaged in protected activity when she participated in the Office of Fair Practice's investigation from November 2014 through May 2015.

224.     Raley engaged in protected activity when she filed her Charge of Discrimination with the EEOC on or about January 15, 2015.

29

225.    Defendant retaliated against Raley when Bell issued Raley a negative form 164 for having a "messy" car despite the fact that Bell was no longer supposed to be supervising Raley, Raley's car was out of service and therefore not able to be subject to inspection, and was not actually "messy."

226.    Defendant retaliated against Raley when it allowed its employees in the Cumberland Barrack to discuss Raley's complaint of discrimination and harassment.

227.    Defendants retaliated against Raley when Captain Fluharty instructed Zuzak to issue Raley a negative 165 and threaten Raley with a transfer for failing to get sixty (60) stops for the month of April despite having high arrest numbers when none of the male troopers in Cumberland Barracks was issued a negative 165 for failing to make sixty (60) stops for the month.

228.    Defendants continue to retaliate against Raley by allowing management to perpetuate rumors about Raley and by targeting, watching, and subjecting Raley to higher scrutiny.

229.    Defendants have not subjected Raley's counterparts who have not filed Office of Fair Practices and EEOC Complaints to this same treatment.

230.    Raley has sustained substantial injury as a result of Defendants illegal retaliation.

## PRAYER FOR RELIEF

Plaintiff Raley respectfully requests the Court enter judgment in his favor and award him the following relief:

a.  Compensatory damages;

b.  Punitive damages;

30

c.  Reasonable attorney's fees and costs; and

d.  Any other relief this Court deems just and equitable.

## REQUEST FOR JURY TRIAL

Plaintiff Raley requests a trial by jury for any and all issues proper to be so tried.

Respectfully Submitted,

Chelsea Raley, PRO SE
12810 Bowling St.
Cumberland, MD 21502
(301) 268-7815 (telephone)
craley4@hotmail.com

A version of this pro se complaint was prepared by
R. Scott Oswald (DMD Bar #25391)
The Employment Law Group, P.C.
888 17th St. NW, 9th floor
Washington, D.C. 20006
(202) 261-2818

31